**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SPRINGFIELD HOSPITAL, Respondent,**

**New England Health Care Employees Union, District 1199, NUHHCE, AFL–CIO, Intervener.**

**No. 177, Docket 89–4055.**

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1989.

Decided March 26, 1990.

Steven Goldstein, N.L.R.B., Washington, D.C. (Linda Dreeben, Supervisory Atty., Joseph E. Desio, Acting General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., of counsel), for petitioner.

Brian E. Hayes, Springfield, Mass. (Ralph F. Abbott, James M. Trono, Skoler, Abbott, Hayes and Presser, of counsel), for respondent.

John M. Creane, Milford, Conn., for intervener.

Before OAKES, Chief Judge,
LUMBARD and PIERCE, Circuit Judges.

PIERCE, Senior Circuit Judge:

The National Labor Relations Board (the "Board") petitions pursuant to § 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(e) (1982), for enforcement of two orders requiring the Springfield Hospital Corp. (the "Hospital"), *inter alia,* to bargain with the New England Health Care Employees Union, District 1199, National Union of Hospital and Health Care Employees, AFL–CIO (the "Union"), as the representative of its technical employees. The Hospital concedes that it has refused to bargain but asserts: that the pre-election arrests of four pro-Union employees necessitates reversal of the election results; that the election was not held in an appropriate unit; and that remand to the Board is appropriate since the members of the certified unit were not given an opportunity to vote in a recent union affiliation election. We reject these contentions and grant the petition.

## PROCEDURAL BACKGROUND

In October 1981, the Union filed a petition seeking recognition as the exclusive collective bargaining representative of the

Hospital's technical and service and maintenance employees.

On January 7, 1982, after hearings, the Board's Acting Regional Director ordered elections in a technical unit and a service and maintenance unit. While the parties had stipulated that the Hospital's six medical laboratory technicians should be included in the technical unit, the Regional Director determined that three medical technologists and two laboratory section heads were professional employees and thus not properly included in the unit. Subsequently, the Board denied the Hospital's request for review of the Regional Director's decision.

The election was held on February 4, 1982. After four challenged ballots were counted, the Union narrowly won the technical unit election and overwhelmingly lost the service and maintenance unit election.

Both sides filed objections, and, on June 19, 1985, an administrative law judge ("ALJ") found that the Hospital had committed numerous unfair labor practices in violation of sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1), (3) (1982). The ALJ recommended (1) that the Hospital be required to take affirmative action to remedy the effects of several of these unfair labor practices; (2) that the Union's objections to the service and maintenance unit election be sustained; (3) that the Hospital's objections to the technical unit election be overruled; and (4) that the Union be certified as the collective bargaining representative of the technical unit.

The Hospital and the Union each filed exceptions to the ALJ's decision, and, on September 30, 1986, the Board, with minor modifications not relevant herein, affirmed the ALJ's decision. The Board adopted the recommended order, as modified, and certified the Union as the collective bargaining representative of the technical unit. 281 N.L.R.B. No. 76 (1986).

Thereafter, the Hospital refused to bargain with the Union and refused to supply requested information. The Union filed an unfair labor practice charge, and the Board's General Counsel issued a complaint against the Hospital alleging violations of sections 8(a)(5) and 8(a)(1) of the Act, 29 U.S.C. § 158(a)(5), (1) (1982). On September 30, 1987, the Board rejected the Hospital's defenses and granted the General Counsel's motion for summary judgment. 286 N.L.R.B. No. 65 (1987). The Board then filed the present application seeking enforcement of its orders.

## FACTUAL BACKGROUND

The Hospital does not contest the majority of the unfair labor practices found by the Board; the principal issue herein turns on the arrests of four pro-Union employees on February 1, 1982 which arrests, the Hospital contends, mandate sustaining its objections to the technical unit election.[1]

The ALJ made detailed findings as set forth hereinbelow. Over the weekend of January 30–31, 1982, the Union mobilized off-duty employees who entered the hospital to participate in meetings relating to the impending election and to solicit support. In preparation for this Union activity, several of the Hospital's supervisors returned there over the weekend to insure that the off-duty employees did not interfere with the Hospital's operations. These supervisors testified before the ALJ that the off-duty employees walked through the corridors in groups as large as six and disrupted the Hospital's operations on several occasions during the weekend.

However, at a meeting held on Monday, February 1, 1982, the supervisors reported to Eric Rieseberg, the Hospital's Administrator, that no significant incidents had occurred during that weekend; further, no disciplinary proceedings arose out of the events of January 30–31. With respect to various alleged incidents, the ALJ either (1)

---

**1.** The Hospital expressly states that while it does not necessarily agree with all of the violations found by the Board, it contests "[o]nly those unfair labor practice findings which relate to the [February arrests]." Although some review of objections raised before the Board may be justified even in cases of complete default, *NLRB v. Semco Printing Center, Inc.*, 721 F.2d 886, 893 & n. 4 (2d Cir.1983), in light of the Hospital's concession, the Board is entitled to summary affirmance of the numerous unchallenged unfair labor practice findings.

rejected the supervisors' testimony; (2) found that the incidents had not interfered with the operations of the Hospital; or (3) determined that Rieseberg had not been informed of the incidents.

According to the ALJ's findings, on February 1, 1982, off-duty employees continued soliciting support for the Union and attempting to participate in meetings between individual supervisors and individual on-duty employees. Early that afternoon, approximately fifteen pro-Union, off-duty employees learned that the Hospital's Support Services Director, Peter Hofstetter, was holding an election-related meeting in the housekeeping department—located in the basement of the hospital building, away from patient care areas. The off-duty employees went to the housekeeping department and, due to the noise generated when they began gathering outside the meeting, Hofstetter directed a supervisor, Steven Parker, to close the door.

After the door was closed, one of the off-duty employees, Simone Murray, knocked on the door and she and another off-duty employee, Beverly Camire, asked if they could attend the meeting.[2] When Hofstetter responded that they could not, Murray asked two of the employees attending the meeting whether they were okay and whether they were being held against their will. After Murray was assured that everything was alright, the door was closed and the meeting continued.

Subsequently, according to the ALJ, when Supervisor Parker requested that they leave the immediate vicinity of the meeting, the off-duty employees moved down the hallway but remained, quietly, near the housekeeping area in order to be available to answer any questions which the employees attending the meeting might have. Director Hofstetter continued the meeting, unaffected by the off-duty employees in the hallway.

In the meantime, Administrator Rieseberg arrived in the housekeeping area and attempted to get the off-duty employees to leave the corridor. He informed them that they were in an unauthorized area[3] and that they were disrupting the Hospital's operations and its ability to meet its patients' needs. The off-duty employees refused to comply with Rieseberg's request that they leave, whereupon he returned to his office.

When the meeting ended, there were several brief conversations between the on-duty employees leaving the meeting and the off-duty employees who had waited outside. Upon learning of these conversations, Rieseberg sent a personnel assistant, Susan Jacques, to the basement with instructions to order the off-duty employees to leave the housekeeping area. Subsequently, Jacques gave a "second verbal warning" to an off-duty employee who was engaged in union activity.

Jacques reported this encounter to Administrator Rieseberg who, after consulting the Hospital's attorneys, called the police. Rieseberg told Police Chief Herdt that approximately fifteen off-duty employees were "roaming" in non-designated areas of the hospital and that one had distributed leaflets in the intensive care unit. Rieseberg, expressing concern that the off-duty employees were disturbing visitors and disrupting the quality of patient care,

**2.** While the ALJ did not make a finding on this issue, there was testimony before him that Rieseberg had given individual supervisors the discretion to decide whether to permit off-duty employees to participate in anti-Union meetings. At least one supervisor had permitted such participation in a one-to-one meeting.

**3.** During the election campaign the Hospital first imposed a rule requiring off-duty employees to leave the premises promptly at the end of their shifts and subsequently adopted a policy limiting the access of off-duty employees to the cafeteria, coffee shop, lobby and discharge area. The Board ultimately determined that the no-ac-

cess rule and the no-access policy were invalid since neither had been adequately disseminated and both were applied in a discriminatory manner. *See Tri–County Medical Center, Inc.,* 222 N.L.R.B. 1089, 1089 (1976) (validity of no-access rule governed by three-part test: whether rule (1) only limits access to interior of the plant and other working areas; (2) is clearly disseminated to all employees; and (3) is applied in a non-discriminatory manner to all off-duty employees); *NLRB v. Pizza Crust Co. of Pennsylvania, Inc.,* 862 F.2d 49, 53 (3d Cir.1988) (adopting *Tri–County* test).

requested that the police evacuate and, if necessary, arrest the off-duty employees.

Herdt dispatched Lieutenant Chadbourne and Investigator Estey to the hospital premises. When they arrived, Director Hofstetter informed Chadbourne that twelve to fourteen off-duty employees were roaming through the building; that these employees had not limited themselves to the areas in which they were permitted to be, *see supra* footnote 3; and that they had refused requests to leave.

Lt. Chadbourne first encountered four off-duty employees in the lobby and requested that they leave the premises. When they refused, Chadbourne called State's Attorney Sheehan and informed him that the Hospital had complained that the off-duty employees were roaming through the premises. Sheehan told Chadbourne to issue citations for trespassing if the off-duty employees remained on the premises after being asked to leave.

Later, Lt. Chadbourne saw five off-duty employees in the discharge area and asked them to leave the premises. He told them that he had been informed that they had been in patient care areas and had been disorderly and warned that if they refused to leave after citations were issued, they would be arrested.

These off-duty employees went to the parking lot and a union organizer, Richard Sanders, informed them that they could lawfully remain in the building so long as they were not disruptive. After the five off-duty employees returned to the discharge area, Investigator Estey issued citations charging each of them with trespassing. After the police told these off-duty employees that they could not remain on the premises,[4] each found her way to the cafeteria where four of them were then arrested.

The ALJ rejected the Hospital's assertion that the off-duty employees had invited the arrests and found that the Hospital, "[b]y

causing the police to come upon its premises to enforce its no-access policy," was responsible for the arrests. The ALJ further found that since the arrests "were likely to interfere with, restrain, and coerce [the Hospital's] employees in the exercise of their Section 7 right to engage in union activity," the Hospital had violated Section 8(a)(1) of the Act. The Board adopted these findings as well as the ALJ's recommendations that the Union's objections to the service and maintenance unit election be sustained and that the Hospital's objections to the technical unit election be overruled. The Board ordered that the former election be repeated and certified the latter election.

## DISCUSSION

### I.

■ The Hospital first argues that the Board erred in finding that it was responsible for the arrests. In reviewing this factual determination, we consider only whether there is substantial record evidence supporting the conclusion reached by the Board. *See* 29 U.S.C. § 160(e) (1982); *NLRB v. Pratt & Whitney Air Craft Div., United Technologies Corp.*, 789 F.2d 121, 126 (2d Cir.1986). Thus, even if we disagree with the Board's findings, reversal based upon this factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusions drawn by the Board. *See Pratt & Whitney*, 789 F.2d at 126; *see also Medical Center of Beaver County, Inc. v. NLRB*, 716 F.2d 995, 1002 (3d Cir.1983) (Higginbotham, J., dissenting).

■ The record evidence shows that Administrator Rieseberg told Chief Herdt that a group of off-duty employees were roaming in "non-designated" areas of the hospital, distributing leaflets in the intensive care unit, disturbing visitors and interfer-

---

**4.** Although the ALJ did not make a finding on this point, there was testimony that, after the five off-duty employees received citations, State's Attorney Sheehan assured Organizer Sanders that there would be no need for arrests

so long as the off-duty employees were not disorderly and did not disturb patient care; Sanders conveyed this information to the off-duty employees prior to the arrests.

ing with patient care and hospital operations. Rieseberg requested that the off-duty employees be removed from the premises and, if necessary, arrested. Director Hofstetter reinforced the impression that the off-duty employees were acting improperly when he told Lt. Chadbourne that a large group of off-duty employees were roaming the hospital and were in non-designated areas. Each contact between the police and the off-duty employees occurred in the presence of Hospital managers, and in areas which had been designated for the presence of the off-duty employees. Thus, the conclusion can be drawn that Lt. Chadbourne relied on Administrator Rieseberg's and Director Hofstetter's reports of misconduct in ordering the off-duty employees to leave the hospital building.

The Hospital asserts that, in order to insure the care of its patients, it had the right to seek the removal of the off-duty employees and argues that the Board erred in finding that the off-duty employees had not disrupted the housekeeping department meeting. We find no basis for disagreement with the Board's conclusion that Administrator Rieseberg was not justified in representing to the police that the off-duty employees were disturbing visitors and interfering with the quality of patient care. The ALJ found that the events in the housekeeping area, located in the basement of the hospital, did not affect patient care and we note that Director Hofstetter testified that, once the door had been closed, the noise produced by the off-duty employees did not disrupt the meeting. Further, as petitioner argues, the Hospital has not explained either its failure to inform the police of the identity of the participants in the alleged disruption of the housekeeping department's meeting, or the undisputed fact that one of the off-duty employees arrested had not been present in the basement.

The Hospital urges that its decision to call the police must be measured in light of prior confrontations and especially the events of January 30–31. As we have noted, however, on the morning of February 1, Administrator Rieseberg had been informed that there were no unusual events

of any great consequence over the preceding weekend. Indeed, the minor nature of the events of January 30–31 is further demonstrated by the fact that no disciplinary actions eventuated. Additionally, while the four-month election campaign was marked by several confrontations, these incidents, considered either individually or collectively, do not conclusively support the Hospital's claim that the events of February 1 were "the culmination of an organizing campaign marked by a series of escalating and calculatedly confrontational events carried on inside the Hospital building."

■ Finally, the Hospital vehemently asserts that the off-duty employees had ignored its "lawful" requests that they leave the premises. While the obvious paramount function of a hospital is to provide health care to its patients in a setting conducive to achieving this goal, section 7 of the Act, 29 U.S.C. § 157 (1982), protects the rights of employees to organize and bargain collectively. This encompasses the right effectively to communicate with other employees, at the jobsite, regarding self-organization, and it is the Board's function to balance this interest with the employer's right to maintain discipline in order to achieve its raison d'etre. *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491–92, 98 S.Ct. 2463, 2468–69, 57 L.Ed.2d 370 (1978) (citing *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945)); *see also Beth Israel Hosp.*, 437 U.S. at 497, 98 S.Ct. at 2471 (Congress left it to the Board to strike the proper balance between the interests of hospital employees, patients and employers).

■ Here, the Board found that the off-duty employees were not disrupting patient care, that they were engaging in protected conduct and that they were cited and arrested in areas which had been designated for their presence. Further, although the off-duty employees had previously entered "non-designated" areas, the Hospital does not challenge the Board's finding that its no-access policy was invalid. *See supra* footnotes 1, 3. It was within this framework that the Board concluded that the

Hospital was not justified in seeking police intervention. We believe this conclusion is supported adequately by the record.

██ Based in part on its finding that the Hospital was solely responsible for the arrests and that the arrests interfered with the employees' exercise of their right to engage in union activity, the Board set aside the service and maintenance election, which the Union had lost, and directed that a new election be held; it upheld the technical unit election, which the Union had won. While its argument is less than clear, the Hospital appears to claim that this distinction is unwarranted.

In *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir.1970) (Friendly, J.), *cert. denied*, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971), this court stated: "The conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." Consequently, a party seeking to set aside an election has "the 'heavy burden' of establishing that the Board abused its discretion in certifying the election." *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1036 (2d Cir.1974) (citing *Polymers, Inc. v. NLRB*, 414 F.2d 999, 1004 (2d Cir.1969), *cert. denied*, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970)).

 It is well-established that courts, as well as the Board, in representation proceedings, apply the equitable principle that relief will not be afforded to one with unclean hands. *See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 687, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944) (employer may not use its own improper actions to "disestablish [a] union as the bargaining representative of the employees, previously designated as such of their own free will"); *cf. Republic Elec., Inc.*, 266 N.L.R.B. 852, 853 (1983) (noting that "a party to an election is ordinarily estopped from profiting from its own misconduct"). Indeed, where the employer undermines the union's strength and destroys the laboratory conditions needed for fair elections, the Board may issue a bargaining order until the ef-

fects of the employer's acts have dissipated. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610–15, 89 S.Ct. 1918, 1938–40, 23 L.Ed.2d 547 (1969); *Gottfried v. Mayco Plastics, Inc.*, 472 F.Supp. 1161, 1166–67 (E.D.Mich.1979) (*Gissel* injunction appropriate where union loses representation election due to employer wrongdoing). While *Gissel* requires an independent showing that the union enjoys the support of the majority of the bargaining unit, we see no abuse of discretion here in certifying an election where the Union was victorious despite the Hospital's conduct.

## II.

The Hospital next asserts that the Board erred in excluding the Medical Technologists (the "MTs") and the Laboratory Section Heads (the "LSHs") from the technical unit based upon the determination by the Board's Acting Regional Director (the "Regional Director") that MTs and LSHs are professional employees.

██ Under section 2(12)(a) of the Act, a "professional employee":

engage[s] in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes.

29 U.S.C. § 152(12)(a) (1982). Technical employees, on the other hand, are individuals who do not meet this definition, but whose work involves the use of independent judgment and requires specialized training usually acquired in colleges, tech-

nical schools, or through special courses. *Litton Indus. of Maryland, Inc.*, 125 N.L.R.B. 722, 724–25 (1959); *see NLRB v. Sweetwater Hosp. Ass'n*, 604 F.2d 454, 456 n. 2 (6th Cir.1979).

In drawing this distinction, which has been called both "fine," *Illinois Valley Community Hosp.*, 261 N.L.R.B. 1048, 1049 (1982), and "ill defined," *Twin City Hosp. Corp. v. NLRB*, 889 F.2d 1557, 1561 (6th Cir.1989), the Board's analysis should focus on "the work performed and the 'consistent exercise of discretion and judgment in its performance,' rather than the employee's qualifications," *A.A. Matthews Assoc.*, 200 N.L.R.B. 250, 251 (1972); *see also NLRB v. HMO Intern./California Medical Group Health Plan, Inc.*, 678 F.2d 806, 811 (9th Cir.1982) (Kennedy, J.). While comparisons with other employees are useful in determining whether the scope of discretion exercised is sufficient to justify treating an employee as a "professional," *see Westinghouse Elec. Corp. v. NLRB*, 440 F.2d 7, 9–10 (2d Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971), the proper focus is "on the criteria establishing professional status and the totality of the background, experience, and work responsibilities of the ... [employees in question]," *Illinois Valley Community Hosp.*, 261 N.L.R.B. at 1048.

If supported by substantial record evidence, a determination that an employee is a professional is entitled to deference and will be reversed only if the Board abused its discretion. *Twin City Hosp. Corp.*, 889 F.2d at 1560, 1561; *see Mercy Hosp. of Buffalo v. NLRB*, 730 F.2d 75, 77–78 (2d Cir.1984).

### A.

Both MTs and Medical Laboratory Technicians ("MLTs") work in the Hospital's laboratory performing clinical tests and analyses as ordered by physicians. At the times relevant herein, MTs were required to have a four-year bachelor of science degree and to be either registered by a professional society or certified by the United States Department of Health, Education and Welfare. MLTs, on the other hand, were required to have a two-year associate degree and an appropriate registration or certification.

The record evidence indicates that the Hospital was not required by the relevant authorities to staff its laboratory with a certain number of MTs; whenever a vacancy occurred in the laboratory, the Hospital accepted applications from both MTs and MLTs. MTs and MLTs worked side-by-side. Both rotated through the various sections of the laboratory and, despite the MTs' greater education, MTs and MLTs were considered interchangeable in their job duties. The Hospital did not attempt to insure that MTs either performed more difficult tests or worked those shifts when the laboratory was staffed by only one person.

Notwithstanding these similarities, according to the job descriptions for the two positions, only MTs were expected (1) to be "able to perform complex analyses which require[ ] knowledge of technique, principles, instrumentation and also require[ ] fine-line discrimination of several items;" (2) to be responsible for quality control of the analyses which (s)he performs; and (3) to assist "in establishing, monitoring, and trouble-shooting all the quality control systems" in the laboratory. By contrast, MLTs were only "expected to share the responsibility" for performing various tests. While the Hospital argues that these job descriptions are irrelevant, the Regional Director was entitled to rely upon Department Head LaPlante's testimony that the job descriptions of each of the positions at issue herein accurately reflected the actual job requirements.

Newly hired MTs were paid 10–20% more per hour than newly hired MLTs. Additionally, according to Department Head LaPlante, as a result of their greater education, MTs did not require as much supervision as MLTs.

Laboratory Director LaPlante further testified that MTs use more independent judgment than MLTs. Thus, while MTs performed the same tests as MLTs, there was evidence supporting the Regional Director's finding that the Hospital expected

MTs, who had greater education, "to rely on their reason, independent judgment and discretion in the interpretation and analysis of tests performed and in detecting and analyzing [distorted] test results." *See Illinois Valley Community Hosp.*, 261 N.L.R.B. at 1049 (finding that MTs are professionals based, in part, upon expectation of greater proficiency); *Missouri Pacific Employees' Hosp. Ass'n*, 251 N.L.R.B. 1547, 1548 (1980) (technologists deemed professionals where they alone "are permitted to exercise their independent judgment and discretion in the interpretation and analysis of the medical tests performed"). Furthermore, in 5–10% of the tests performed, MTs were expected to identify the reasons for discrepancies between the test results and the laboratory's quality control parameters.

Although the record could support a conclusion that the MTs are technical employees, the Board's finding that they were professionals is supported by substantial evidence, *see Pratt & Whitney*, 789 F.2d at 126, and does not constitute an abuse of discretion.

### B.

■ Two LSHs were responsible for coordinating the activities and procedures of the various sections of the laboratory. According to the record evidence, one LSH, Donna Peniuk, was an MT while the other, Pamela Joyce, was an MLT. The LSHs spent approximately 80–90% of their time performing the same tests as the MTs and the MLTs. The other 10–20% of their time was devoted to helping Department Head LaPlante (1) control the inventory; (2) evaluate new procedures; and (3) trouble-shoot and monitor quality control programs. Department Head LaPlante testified that the LSHs had more technical knowledge than the MTs and MLTs, and that the other employees in the laboratory used the LSHs as resources when they encountered technical problems.

The Regional Director excluded Laboratory Section Head Peniuk, an MT, from the technical unit based on his determination that MTs are professionals. With respect to Laboratory Section Head Joyce, an MLT, the Regional Director noted that the job description for the LSH position incorporates the MTs' duties. While Joyce had only a two-year associate degree, she had more seniority than any other MT and performed the same duties as Peniuk, and, therefore, the Regional Director determined that she too should be deemed a professional. *See Marcus J. Lawrence Memorial Hosp.*, 249 N.L.R.B. 608, 616 (1980) (professional status may be found, absent a professional degree, where an employee obtains same knowledge as, and functions interchangeably with, professionals), *enforced in part, enforcement denied in part without opinion*, 652 F.2d 64 (9th Cir.1981); *see also A.A. Matthews Assoc.*, 200 N.L.R.B. at 251 (determination of employees' status depends upon work performed rather than qualifications); *cf. Express–News Corp.*, 223 N.L.R.B. 627, 630 (1976) (under § 2(12) "professional" status may be based upon prolonged experience).

In light of our acceptance of the Board's determination that MTs are professionals, we see no abuse of discretion in its decision to treat LSHs, who perform as MTs, similarly.

### III.

■ Finally, the Hospital moves for a remand to the Board for further proceedings in light of a May 27, 1989 election in which each district of the National Union of Hospital and Health Care Employees was given the option of affiliating with either the Service Employees International Union ("SEIU") or the American Federation of State, County and Municipal Employees ("AFSCME"). Apparently, the Hospital's employees were not notified of this election or given the opportunity to vote and the Hospital argues that the affiliation vote involved "a question concerning representation" which necessitated the participation of the employees who were in the bargaining unit, although not yet members of the Union. *See NLRB v. Financial Inst. Employees, Local 1182*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986).

Notwithstanding its characterization of the affiliation vote as a "schism" within the

Union, we do not believe that the Hospital has " 'demonstrate[d] by objective considerations that it has some reasonable grounds for believing that the [U]nion has lost its majority status.' " *Id.* at 198, 106 S.Ct. at 1011 (quoting *United States Gypsum Co.*, 157 N.L.R.B. 652, 656 (1966)). Moreover, it appears that the events relating to the May 1989 affiliation election are unrelated to the orders at issue herein: whether the Hospital committed an unfair labor practice when it refused to negotiate with the Union in 1986 and 1987. Thus, we see "no useful purpose [to be] served by permitting the employer to defend the propriety of an earlier refusal to bargain by relying on subsequent events that had nothing to do with the refusal." *NLRB v. Fall River Dyeing & Finishing Corp.*, 775 F.2d 425, 433 (1st Cir.1985), *aff'd on other grounds*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *see also NLRB v. Great Western Coca–Cola Bottling Co.*, 740 F.2d 398, 406 (5th Cir.1984); *NLRB v. Union Carbide Caribe, Inc.*, 423 F.2d 231, 235–36 (1st Cir. 1970). Therefore, the Hospital's motion to remand is denied.

The Board's application for enforcement is granted.