**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**VANGUARD TOURS, INC., Bedford Bus Co., Inc., and Local 456, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, Respondents.**

**No. 143, Docket 92–4024.**

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1992.

Decided Dec. 2, 1992.

Joseph S. Rosenthal, New York City (Carol M. Roberts, Bondy & Schloss, on the brief), for respondents Vanguard Tours, Inc. and Bedford Bus Co., Inc.

Roy Barnes, Hempstead, N.Y., for respondent Local 456, IBT.

Vincent Falvo, N.L.R.B., Washington, D.C. (Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Assoc. Gen. Counsel, and John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., on the brief), for petitioner.

Before FEINBERG, NEWMAN, and CARDAMONE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This case is before the Court upon the petition of the National Labor Relations Board to enforce its order issued on September 28, 1990, 300 NLRB No. 30. The order includes requirements that the respondents Vanguard Tours, Inc. and Bedford Bus Co., Inc. ("Vanguard" or the "employer") make whole certain employees who suffered temporary discharge following a strike in 1981 and compensate certain other employees who were named in a lawsuit brought by Vanguard to enjoin the strike. Because we conclude that the Board erred in concluding that the strike was an unfair labor practice strike and in concluding that the employer's lawsuit lacked a reasonable basis in fact or law, we

enforce in part and deny enforcement in part.

## Background

Vanguard is a school bus and charter transportation company with several offices in New York. At the time of the events at issue in this case, it employed approximately 300 people, of whom 18 were members of respondent Local 456, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO ("Local 456" or "union"). The union members were all classified as "full-time" or "regular" employees, and the non-union employees were classified as part-time (although some appeared to work a "full-time" day). Pursuant to two collective bargaining agreements, one signed in 1978 and another in 1981, the full-time employees enjoyed a much higher hourly wage than the part-time employees, as well as benefits unavailable to the part-time employees. This dispute grows out of the part-time employees' dissatisfaction with this arrangement. Commencing in 1980, the part-time employees engaged in various concerted activities, including a strike, to protest their treatment, and the employer took various actions in response.

In 1981, the Regional Director filed complaints concerning these responses as well as other alleged unfair labor practices involving the structure of the Vanguard–Local 456 relationship, the pension plan provisions of the collective bargaining agreements, and a workplace rule restricting discussion of work conditions. In 1984, an ALJ found against the employer and the union on most allegations. The Board's Decision and Order of September 28, 1990, adopted most of the ALJ's conclusions of law and most provisions of his remedial order, finding violations of section 8(a)(1)–(3), (b)(1)(A), (b)(2) of the Labor Management Relations Act of 1947, 29 U.S.C. § 158(a)(1)–(3), (b)(1)(A), (b)(2) (1988). The only significant conclusion of the ALJ not adopted by the Board was that the two-tiered wage and benefit system maintained by the employer was itself an unfair labor practice. The Board concluded that the differentials in pay and benefits reflected a bona fide classification of employees into full-time and part-time categories, and did not constitute discrimination on the basis of union membership.

## Discussion

### 1. The Strike

Several of the Board's findings of unfair labor practices rest on a determination that the part-timers' strike was a protected strike intended to protest the employer's prior unfair labor practices. *See* conclusion of law 7 (renumbered)[1] (threatening strikers with discharge and loss of benefits in violation of section 8(a)(1)); conclusion of law 8 (discharging striking employees and reinstating them conditionally with loss of seniority, in violation of section 8(a)(1)); conclusion of law 9 (discharging certain other striking employees in violation of section 8(a)(1)). The employer now argues that there was no substantial evidence to show any motivation for the strike other than an economic one, and claims that the finding of an unfair labor practice is inconsistent with the Board's determination (overruling the ALJ) that the employer had not committed an unfair labor practice by maintaining a disparate system of wages and benefits for union and non-union employees.

While the seminal Supreme Court case on unfair labor practice strikes, *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1955), involved a strike "solely against unfair labor practices," *id.* at 271, 76 S.Ct. at 352, we have made clear that a strike may have mixed motivations and still be classified as an unfair labor practice strike. *See, e.g., NLRB v. Heads & Threads Co.*, 724 F.2d 282, 288 (2d Cir.1983). The Board found a separate unfair labor practice in the em-

---

**1.** All references to the Board's conclusions of law and to the provisions of the Board's order have been renumbered in light of the deletions made by the Board. A conformed copy of the renumbered provisions has been made available to the parties in an unpublished appendix to this opinion.

ployer's maintenance of a system whereby its supervisors acted as union shop stewards, and specifically found that this violation was "a substantial contributing factor to the strike." Upon a review of the record, we have concluded that this finding is not supported by substantial evidence. Each employee who testified as to the cause of the strike articulated exclusively economic rationales. Perhaps in a hypothetical case, economic grievances that otherwise would have been redressed through collective bargaining can cause an unfair labor practice strike when the employer has co-opted the union's representatives. In such a case, both unfair labor practices and economic grievances would have combined to cause the strike. There is no suggestion on this record, however, that dissatisfaction with the representation arrangement, as opposed to dissatisfaction with the economic consequences of that arrangement, was a cause of the part-time employees' strike.

Finding no substantial evidence to support conclusion of law 6, we deny enforcement to provisions A(1)(d), A(1)(h), A(1)(i), A(2)(a), and A(2)(b) of the Board's remedial order.

### 2. The Lawsuit

On the day the strike commenced, January 9, 1981, the employer filed suit in New York Supreme Court, seeking injunctive relief and $500,000 in damages from each of 24 strikers. The State Court issued a temporary restraining order, effectively ending the strike, but the suit remained pending for another two weeks. On January 15, Vanguard dismissed all but seven "ringleaders." The ringleaders were obliged to retain counsel and required to appear in court on January 23, at which time the employer asked the Court to dismiss the suit in its entirety. Overruling the ALJ, the Board concluded that it was permissible for Vanguard initially to have filed the suit. But the Board determined that leaving the suit pending for eight days after January 15—after the strike had ended—constituted an unfair labor practice.

In *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), the Supreme Court struck a balance between protected rights under labor law and the First Amendment right to institute legal proceedings. The Court held that a pending lawsuit can be an unfair labor practice only if it is retaliatory in motive and lacks a reasonable basis in fact or law. *Id.* at 743–44, 103 S.Ct. at 2170. Once the suit has been adjudicated, however, the standard is less forgiving to persons who have filed a retaliatory suit. If the plaintiff has lost on the merits—even if he had a reasonable basis in bringing suit—the Board may consider the filing of the suit to have been an unfair labor practice. *Id.* at 747, 749, 103 S.Ct. at 2171, 2173; *see also id.* at 753, 756, 103 S.Ct. at 2175, 2176 (Brennan, J., concurring); *Premier Electrical Construction Co. v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 374 n. 7 (7th Cir. 1987); *Dash v. NLRB*, 793 F.2d 1062, 1070 (9th Cir.1986); *Sheet Metal Workers' International Association v. NLRB*, 716 F.2d 1249, 1265 (9th Cir.1983).

In this case, there is little question that Vanguard had a retaliatory motive, perhaps at the outset, and no later than the time it permitted the suit to remain pending against certain defendants. More difficult is determining the applicable standard for evaluating whether the suit was sufficiently lacking in merit to constitute an unfair labor practice. The ALJ took the position that any termination favorable to the defendants constituted a loss on the merits, and that accordingly it was irrelevant whether the suit may have had a reasonable basis in fact or law. Having "lost" once, the employer automatically lost again. The Board, concerned that this position discouraged the settlement of lawsuits, adopted a different stance. In the Board's view, any termination favorable to the defendants gives rise to a presumption that a suit lacked a reasonable basis in fact or law. To avoid a finding that the retaliatory lawsuit was an unfair labor practice, the employer must come forward with evidence to show a reasonable basis in fact or law. Convinced that the employer did not do so in this case, the Board held that the

continuation of the lawsuit constituted an unfair labor practice.

█ Both positions are inconsistent with *Bill Johnson's*. The crucial language of the decision provides:

> In instances where the Board must allow the lawsuit to proceed, if the employer's case in the state court ultimately proves meritorious and he has judgment against the employees, the employer should also prevail before the Board, for the filing of a meritorious lawsuit, even for a retaliatory motive, is not an unfair labor practice. If judgment goes against the employer in the state court, however, *or if his suit is withdrawn or is otherwise shown to be without merit,* the employer has had its day in court, the interest of the State in providing a forum for its citizens has been vindicated, and the Board may then proceed to adjudicate the ... unfair labor practice case.

461 U.S. at 747, 103 S.Ct. at 2172 (emphasis added). It is possible to read this language, as did the ALJ, for the proposition that withdrawal of the suit is equivalent to a judgment against the employer, and requires a finding that a suit was sufficiently lacking in merit as to constitute an unfair labor practice. We think the better reading, however, requires the Board to find that the withdrawn suit lacked a reasonable basis in fact or law. There are many reasons a party may choose to withdraw a suit. A party may become convinced that his position is baseless, but it is at least as likely that the party reached a settlement or determined that the costs of proceeding exceeded the expected benefits. In no instance can it be said that the disposition signifies a determination by the state court that the suit was "without merit." Under the Board's position, the incentive for an employer to settle a lawsuit would be greatly lessened, since anything short of full victory would constitute a presumptive admission of an unfair labor practice.

█ Because the Board did not find that Vanguard's suit lacked a reasonable basis in fact or law, either at the outset or at the point when the employer briefly permitted it to remain pending, the Board's determination that the lawsuit was an unfair labor practice may not be sustained. Accordingly, we conclude that substantial evidence does not support conclusion of law 11 and deny enforcement to provisions A(1)(j), A(1)(*l*), and A(2)(c) of the Board's remedial order, which are based on that finding.

3. Other Findings

█ a. *Discrimination against Gloria Gerosa.* Gloria Gerosa was a part-time driver who in 1982 appeared on the verge of qualifying as a full-time or regular driver. She inquired about recognition as a full-timer and joining the union, at which point the company cut her hours back sharply. The ALJ rejected Vanguard's proffered economic rationale for the decision and concluded that the decision was the result of discrimination against Gerosa as a non-union member in violation of section 8(a)(1), (3). The Board adopted this finding.

Vanguard contends that this finding was inconsistent with the Board's conclusion that the employer was indifferent to union membership and had a lawful economic motivation to attempt to limit the number of regular employees. Even if it was generally indifferent to union membership, however, Vanguard could still have discriminated against a particular employee on a particular occasion. That is what the ALJ found, relying in particular on a statement to Gerosa from the company's Safety Director that he knew people were trying to get into the union and "he wanted to put a stop to it." The ALJ and Board were in a better position than are we to make this determination of motive and credibility. Substantial evidence supports conclusion of law 10, and we therefore enforce provisions A(1)(k) and A(2)(f) of the remedial order.

b. *The "destructive criticism" rule.* Vanguard's employee handbook contained a rule prohibiting employees from making statements concerning wages, hours, the condition of buses, etc. The rule is susceptible to two interpretations. Under one reading, it applies only when such statements could be overheard by passengers. Under the other reading, the rule restricts

discussions whenever employees are on company property or on duty. The Board, preferring the broader reading, found that this "destructive criticism" rule was an overly broad prohibition on discussion of union matters during non-working time in non-working areas. It consequently held the rule to be an unfair labor practice under section 8(a)(1) and enjoined the company from promulgating or maintaining such a rule. Vanguard now renews its argument for the narrower reading, claiming that the rule was limited to situations "where employees were disloyally impugning the Company in the hearing of its present or prospective passengers." Brief of Respondents at 35. It also claims that there was no indication the rule had been enforced, and that there cannot be an "unfair labor practice in a vacuum." Reply Brief of Respondents at 21.

■ We believe the Board permissibly read the rule, consistent with its plain language, as not limited to working time and working areas. Vanguard adduced no evidence to indicate that employees had been told the rule would be enforced only narrowly, or that it would not be enforced at all. Because of the likely chilling effect of such a rule, the Board may conclude that the rule was an unfair labor practice even absent evidence of enforcement. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945) ("Such a rule must be presumed to be an unreasonable impediment to self-organization" (quoting *Peyton Packing Co.*, 49 N.L.R.B. 828, 844 (1943))). Substantial evidence supports conclusion of law 3(d), and we therefore enforce provision A(1)(e) of the remedial order.

c. *The pension plan.* The Board found that both the employer and the union had committed an unfair labor practice, in violation of section 8(a)(1)–(3), (b)(1)(A), (b)(2), by establishing and maintaining a pension plan in which membership in the union was a requirement for participation. Neither respondent disputes that such a requirement would be unlawful, *see Radio Officers' Union v. NLRB*, 347 U.S. 17, 47–48, 74 S.Ct. 323, 339, 98 L.Ed. 455 (1954) (disparate pay), but both dispute the existence of such a requirement.

■ Respondents base their challenge on the fact that the requirement of union membership did not actually appear in the collective bargaining agreement. The agreement specifically provided that "[t]he pension plan for all regular full-time employees shall be annexed hereto as Exhibit D." While in practical terms "regular full-time employee" was synonymous with "union member," this alone would not be a basis of liability, since the Board rejected all claims based on disparate treatment of full-time employees and part-time employees. Exhibit D, however, clearly limited participation in the pension plan to union members, requiring for eligibility "three (3) months of service with the Company from the date [the employee] shall became a member of the Union." Both the employer and the union dispute that this plain language was intended to incorporate the exhibit by reference, and they claim that they knew nothing about such a limitation. We find this argument unconvincing. When a contract "annexes" as an essential part the terms of another instrument, the other instrument is deemed part of the contract. The Board properly found that the collective bargaining agreement impermissibly discriminated against non-union members.[2] Substantial evidence supports conclusion of law 5 and 13. We enforce provisions A(1)(g), A(2)(d), A(2)(e), B(1)(c), B(2)(a), and B(2)(b) of the remedial order.

d. *Uncontested findings.* We also approve conclusions of law 3(a), 3(b), 3(c), 4, 12(a), 12(b), and enforce provisions A(1)(a),

---

**2.** Because we find that the collective bargaining agreement incorporated the offending exhibit, we need not determine whether the union has waived its rights to contest findings against it. The union signed a stipulation purporting to waive any rights to contest the findings or conclusions of the Board. The employer did not sign the same stipulation, and the union has claimed that it agreed to the stipulation only on condition that the employer also agree, even though this limitation appears nowhere in the document nor in the contemporaneous cover letter prepared by counsel for the union. *See Local 456, IBT v. NLRB*, No. 92 Civ. 2613 GLG (S.D.N.Y. May 8, 1992) (denying application seeking declaratory judgment that stipulation not binding on union).

A(1)(b), A(1)(c), A(1)(f), and B(1)(a) and B(1)(b) of the remedial order, since respondents have not challenged these conclusions in this Court. *See NLRB v. Springfield Hospital,* 899 F.2d 1305, 1308 n. 1 (2d Cir.1990). We also enforce the collateral record-keeping and posting requirements ordered by the Board at provisions A(1)(m), A(2)(g), A(2)(h), A(2)(i), B(1)(d), B(2)(c), B(2)(d), and B(2)(e) of the remedial order, appropriately modified to reflect the portions of the order to which we have denied enforcement.

4. Delay

■ Vanguard also argues that enforcement should be denied because of the Board's delay in seeking enforcement. We have held previously, however, that when the remedies ordered by the Board involve damages and otherwise making parties whole, as opposed to requiring bargaining, delay is no reason to refuse enforcement. *See NLRB v. S.E. Nichols, Inc.,* 862 F.2d 952, 963 (2d Cir.1988) (distinguishing *NLRB v. Koenig Iron Works, Inc.,* 856 F.2d 1 (2d Cir.1988)), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989). We reject the employer's argument.

### Conclusion

Enforcement granted in part and denied in part.