13 F.3d 619
 145 L.R.R.M. (BNA) 2220, 127 Lab.Cas. P 10,977
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
New England Health Care Employees Union, Dist. 1199, Intervenor,
v.
WINDSOR CASTLE HEALTH CARE FACILITIES, INC.; 1115 Nursing
Home and Service Employees Union, a division of
1115 District Council, H.E.R.E.,
A.F.L.-C.I.O., Respondents.
 No. 539, Docket 93-4130.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 8, 1993.
Decided Jan. 11, 1994.
 
 William A. Baudler, N.L.R.B., Washington, DC (Paul J. Spielberg, Deputy Asst. Gen. Counsel, Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karantinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, John Truesdale, Peter B. Hoffman, N.L.R.B., Washington, DC, of counsel) for petitioner.
 
 
 1
 John M. Creane, Milford, CT, for Intervenor.
 
 
 2
 Morris Tuchman, New York City, for respondent Windsor Castle Health Care Facilities, Inc.
 
 
 3
 Richard M. Greenspan, Ardsley, NY, for respondent 1115 Nursing Home and Service Employees Union.
 
 
 4
 Before: CARDAMONE, JACOBS, and GOODWIN,* Circuit Judges.
 
 JACOBS, Circuit Judge:
 
 5
 The National Labor Relations Board ("NLRB" or "Board") petitions this Court pursuant to 29 U.S.C. Sec. 160(e) for enforcement of its order, dated March 4, 1993, against Windsor Castle Health Care Facilities ("Windsor Castle") and 1115 Nursing Home and Service Employees Union ("Local 1115"). Substantial evidence supports the Board's conclusion that Windsor Castle and Local 1115 engaged in unfair labor practices in violation of 29 U.S.C. Sec. 158(a)(1)-(3), and Sec. 158(b)(1)-(2). We therefore grant the Board's application for enforcement, with one modification addressed below.
 
 BACKGROUND
 
 6
 This case requires us to decide whether Windsor Castle unlawfully assisted Local 1115's efforts to acquire support among Windsor Castle's employees. Administrative Law Judge Robert T. Snyder (the "ALJ") made detailed findings of fact, which we summarize below.
 
 
 7
 In June 1989, Windsor Castle acquired and began operating a nursing home in New Haven, Connecticut. On September 19 and 20 of that year, two employees at the Windsor Castle nursing home circulated a petition soliciting the signatures of employees interested in joining New England Health Care Employees Union, District 1199 ("District 1199").
 
 
 8
 The principal owner of Windsor Castle, Nelson Tuchman, is the chief executive officer of an entity called Winthrop Health Care, which runs another New Haven nursing facility. Windsor Castle's executive director, Israel Fogel, is Winthrop's administrative consultant. Tuchman had experienced difficulties dealing with District 1199 when that union was representing Winthrop employees.
 
 
 9
 At the end of September 1989, Fogel enlisted Windsor Castle's head of housekeeping and laundry, George Suarez, to recruit several new employees. Suarez, in turn, approached a business representative of Local 1115, a rival of District 1199. On October 2, five individuals arrived from New York (the "New York employees") and reported for work at Windsor Castle. One of the New York employees, Sandy Moore, was employed by Local 1115 as an organizer. All five received payments from Local 1115 for their work at Windsor Castle. According to the testimony of Windsor Castle employee Connie Tillman, the New York employees occupied themselves the following week soliciting other employees to sign cards designating Local 1115 as their union. Moore persuaded one employee who was supporting District 1199 to solicit support for Local 1115 by telling her that, since District 1199 was deeply in debt, Local 1115 had been sent in its place. This promotional activity apparently met with success, and on October 5, Tillman overheard Moore speaking on the telephone, saying that he had gotten cards from a majority of Windsor Castle's employees and that he had done what Tuchman had sent him to do. A card count was arranged for the following day.
 
 
 10
 Tillman offered unchallenged testimony that on the morning of October 6, she heard Moore tell a Windsor Castle employee that, as soon as all the necessary cards were gathered, Moore intended to orchestrate a confrontation with Joan McSherry, the director of nursing services, and leave Windsor Castle. That presumably staged confrontation occurred shortly before 1:00 p.m., and McSherry fired all five of the New York employees at that time.
 
 
 11
 A card count was conducted later on October 6, and the arbitrator overseeing the vote determined that Local 1115 had collected cards from a majority of Windsor Castle's employees. Although they had been fired earlier that day, Moore and at least one of the other New York employees were present at the card count. On October 10, the arbitrator issued a written award and order setting forth his conclusion that a majority of Windsor Castle employees had selected Local 1115 as their collective bargaining representative. On the basis of this award and order, Windsor Castle voluntarily recognized Local 1115 as the exclusive representative of its employees. A collective bargaining agreement was quickly concluded between Windsor Castle and Local 1115. This agreement was put in final form and signed on October 16.
 
 
 12
 The collective bargaining agreement included a union security clause. Over the next several months, increasing pressure was exerted on employees to join Local 1115 and sign authorizations to withhold dues from paychecks. When these efforts were unsuccessful, Local 1115 began to demand the discharge of certain employees. This conduct culminated on January 28, 1991, when Fogel confronted one employee, Harriet Banks, and informed her that she would be fired if she did not sign a form authorizing the deduction of dues from her paycheck. She refused and was discharged.
 
 THE BOARD'S DECISION AND ORDER
 
 13
 On March 4, 1993, a three-member panel of the Board issued its decision and order, accepting all of the ALJ's rulings, findings, and conclusions.
 
 
 14
 As to Windsor Castle, the ALJ found (and the Board agreed) that it had:
 
 
 15
 -- violated 29 U.S.C. Sec. 158(a)(1) and (2) by encouraging and supporting agents of Local 1115 in their efforts to solicit members for Local 1115 and by permitting Local 1115 to use Windsor Castle's facility and equipment in those efforts;
 
 
 16
 -- violated 29 U.S.C. Sec. 158(a)(1),(2) and (3) by recognizing Local 1115 and entering into a collective bargaining agreement with that union when it did not represent an uncoerced majority of Windsor Castle's employees;
 
 
 17
 -- violated 29 U.S.C. Sec. 158(a)(1) and (3) by discharging Harriet Banks at Local 1115's request; and
 
 
 18
 -- violated 29 U.S.C. Sec. 158(a)(1) by interrogating its employees regarding protected matters and by threatening its employees with discharge or other reprisals if they engaged in protected activities.
 
 
 19
 As to Local 1115, the ALJ found (and the Board agreed) that it had:
 
 
 20
 -- violated 29 U.S.C. Sec. 158(b)(1)(A) by accepting Windsor Castle's recognition when it did not represent an uncoerced majority of Windsor Castle's employees, by receiving monies deducted from employees' paychecks, and by otherwise threatening, restraining and coercing employees; and
 
 
 21
 -- violated 29 U.S.C. Sec. 158(b)(2) by asking Windsor Castle to discharge employees, including Harriet Banks, for their refusal to join Local 1115 and pay union dues when the employees were under no obligation to do so.
 
 
 22
 The Board's order requires Windsor Castle and Local 1115 (a) to cease and desist from these violations; (b) to post copies of appropriate remedial notices; and (c) jointly and severally, to reimburse employees for fees deducted from their paychecks and to compensate Harriet Banks for losses resulting from her unlawful discharge. In addition, the order requires Windsor Castle to withdraw its recognition of Local 1115 and offer reinstatement to Harriet Banks. Finally, the Board agreed with the ALJ that the violations were "of such a pervasive nature which go to the very heart of the Act," that broad cease and desist language was merited.
 
 
 23
 On June 16, 1993, the Board applied to this Court for enforcement of its order pursuant to 29 U.S.C. Sec. 160(e).
 
 DISCUSSION
 
 24
 The initial argument advanced by Windsor Castle and Local 1115 is that the Board erred in finding that Local 1115 failed to secure uncoerced majority support from Windsor Castle's employees. We must enforce the Board's order if the Board's legal conclusions have a reasonable basis in law, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), and if its factual findings are supported by substantial evidence on the record as a whole. See 29 U.S.C. Sec. 160(e); NLRB v. Wizard Method, Inc., 897 F.2d 1233, 1237 (2d Cir.1990). We will not reject factual findings unless no rational trier of fact could have arrived at the Board's conclusion. NLRB v. United Ins. Co., 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); NLRB v. Springfield Hosp., 899 F.2d 1305, 1310 (2d Cir.1990).
 
 
 25
 The Board accepted the ALJ's findings that Windsor Castle unlawfully assisted Local 1115 from the outset by initiating the contact with the Local 1115 organizers, and by offering them sham employment so that they could engage in employer-authorized organizing efforts. There is substantial evidence on the record to support these findings. Suarez, at Fogel's request, contacted Local 1115, which in turn sent the New York employees to report for work at Windsor Castle. The usual hiring process was circumvented, and the New York employees spent most of their time at Windsor Castle organizing for Local 1115. There was testimony that various supervisors, aware that Local 1115 was a "management union," warned employees against expressing support for District 1199. Additional testimony indicated that the apparent leader of the New York employees, having collected signature cards from a majority of Windsor Castle's employees, orchestrated his own firing and the firing of his fellow New York employees. The circumstances of these firings, the Board found, buttressed its conclusion regarding the sham nature of their employment at Windsor Castle. These facts, and many others meticulously laid out by the ALJ, are supported by substantial evidence on the record. Just as clearly, the Board's conclusion that Windsor Castle's actions constituted unlawful employer assistance has a reasonable basis in law. See, e.g., NLRB v. Vernitron Elec. Components, Inc., 548 F.2d 24, 26 (1st Cir.1977) (employer's allowing union to use premises, combined with employer's hasty recognition of the union, may be sufficient evidence of unlawful assistance); D & D Development Co., 282 N.L.R.B. 224, 228-29, 1986 WL 54235 (1986) (finding unlawful assistance when employer initiated contact with union and continued to participate in the union's organizing efforts).
 
 
 26
 Once it is shown that Windsor Castle unlawfully assisted Local 1115 in garnering union support, any subsequent recognition of the union is tainted. See id. (where union's majority status is obtained with employer's unlawful assistance, "employees cannot be said to have freely selected the union and the union does not represent an uncoerced majority of the employees"). "It is unnecessary, in negating a claim of an uncoerced majority, to show mathematically that less than a majority freely signed authorization cards. A pattern of company assistance can be sufficient to invalidate all cards." Amalgamated Local Union 355 v. NLRB, 481 F.2d 996, 1002 n. 8 (2d Cir.1973). Therefore, because Windsor Castle unlawfully assisted Local 1115's organizing efforts, the disputed results of the card count are immaterial.
 
 
 27
 Windsor Castle and Local 1115 also attack the Board's conclusion that their conduct after the card count violated 29 U.S.C. Sec. 158. However, the conduct at issue could arguably be lawful only if Windsor Castle's recognition of Local 1115 was legitimate. Because we agree with the Board that Local 1115 did not represent an uncoerced majority of Windsor Castle's employees, these claims merit no discussion.
 
 THE BOARD'S BROAD ORDER
 
 28
 The Board also found that the unlawful conduct in this case was sufficiently egregious to warrant the issuance of a so-called broad order, requiring Windsor Castle and Local 1115 to cease and desist from violating in any manner the rights guaranteed to Windsor Castle's employees. The Board's remedial power "is a broad discretionary one, subject to limited judicial review," Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), and should be overturned only if the remedy is punitive or "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [National Labor Relations] Act," Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). A broad order is " 'warranted only when a respondent is shown to have a proclivity to violate the Act, or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights.' " Coil-A.C.C., Inc. v. NLRB, 712 F.2d 1074, 1076 (6th Cir.1983) (quoting Hickmott Foods, Inc., 242 N.L.R.B. No. 177 (1979), and citing NLRB v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941)).
 
 
 29
 The Board approved the ALJ's recommended order directing Local 1115 to cease and desist from "[c]ausing or attempting to cause [Windsor Castle] or any other employer to discharge or in any other manner discriminate against its employees...." (emphasis added). Nothing in the record, however, indicates that Local 1115 had engaged in unlawful conduct against the employees of any employer other than Windsor Castle. In Communications Workers of America v. NLRB, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960), the Supreme Court stated that the union in that case had not been
 
 
 30
 found to have engaged in violations against the employees of any employer other than Ohio Consolidated and we find neither justification nor necessity for extending the coverage of the order generally by the inclusion therein of the phrase "any other employer." "It would seem ... clear that the authority conferred on the Board to restrain the practice which it has found ... to have [been] committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct."
 
 
 31
 Id. at 480-81, 80 S.Ct. at 840 (quoting NLRB v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941)). Applying the principles of Communications Workers of America, we delete "or any other employer" from Sec. B.1. (d) of the Board's order.
 
 
 32
 Local 1115 also challenges the Board's order directing it to cease and desist from "[i]n any other manner restraining or coercing [Windsor Castle's] employees in the exercise of the rights guaranteed them in Section 7 of the Act." This Court has noted that a broad order, such as that at issue here, "would convert any future ... charge against [Local 1115], however unrelated to the conduct here at issue, into a contempt proceeding. Such orders should be reserved for egregious cases...." Trico Products Corp. v. NLRB, 489 F.2d 347, 354 (2d Cir.1973). The record before us justifies the finding that Local 1115 conspired with Windsor Castle to install the union as the employees' representative. Local 1115's conduct both before and after the card count supports a finding that the union's misconduct was egregious and demonstrated a general disregard for the employees' fundamental statutory rights. In these circumstances, such a broad order is appropriate. See NLRB v. Blake Constr. Co., 663 F.2d 272, 285-86 (D.C.Cir.1981) ("The mere fact that the Company has no prior record of NLRB violations does not, in itself, dissipate the egregiousness of the conduct involved in this proceeding.").
 
 CONCLUSION
 
 33
 The Board's order is modified by deleting the words "or any other employer" from Sec. B.1. (d). Enforcement of the order as thus modified is granted.
 
 
 
 *
 Hon. Alfred T. Goodwin, Senior Circuit Court Judge, United States Court of Appeals, Ninth Circuit, sitting by designation